UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **KYRIAKOS DALAMAGKAS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. _____ |
| | § | |
| **THE UNIVERSITY OF TEXAS** | § | |
| **HEALTH SCIENCE CENTER AT** | § | |
| **HOUSTON; BOARD OF REGENTS OF** | § | |
| **THE UNIVERSITY OF TEXAS** | § | |
| **SYSTEM; THE UNIVERSITY OF** | § | |
| **TEXAS SYSTEM MEDICAL** | § | **Jury Demanded** |
| **FOUNDATION; JOEL E. FRONTERA,** | § | |
| **M.D.; MARGARET UTHMAN, M.D.;** | § | |
| **DEANA K. MOYLAN** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT AND EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION

Plaintiff Kyriakos Dalamagkas ("Plaintiff" or "Dalamagkas") files this Verified Original Complaint and Emergency Application for Temporary Restraining Order and for Preliminary Injunction against The University of Texas Health Science Center at Houston ("UTHealth"); Board of Regents of the University of Texas System ("Board of Regents"); The University of Texas System Medical Foundation ("Foundation"); Joel E. Frontera, M.D., Associate Professor/Residency Program Director/Vice-Chair for Education at UTHealth; Margaret Uthman, M.D., ACGME Designated Institutional Official at UTHealth; and Deana K. Moylan, Assistant Vice-President, Diversity & Equal Opportunity, Deputy Title IX Coordinator at UTHealth. The individual defendants are sued in their official capacities.

# I.
## SUMMARY

1.     This lawsuit involves an extremely rare Plaintiff.  Dalamagkas is a tetraplegic and wheelchair-bound, third-year medical resident at UTHealth.  The last seven years of his academic record have been stellar, leading to his joining UTHealth.  Yet Defendants have discriminated against Plaintiff on the basis of his disability and have failed to provide reasonable accommodations to allow him to successfully complete his last year of residency.  Plaintiff brings this action to compel Defendants to cease unlawful discriminatory practices and implement broad policies and procedures that will ensure effective accommodations, full and equal enjoyment, and a meaningful opportunity for paraplegic and tetraplegic individuals to participate in and benefit from Defendant UTHealth's educational offerings and services.

2.     Plaintiff alleges against UTHealth claims of disability discrimination, retaliation, and failure to accommodate under Title II of the Americans with Disabilities Act of 1990, as Amended ("ADA").  Plaintiff further alleges against UTHealth claims of disability discrimination, failure to accommodate and retaliation pursuant to Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act").  Plaintiff also alleges violations of his rights under the Due Process Clause of the Fourteenth Amendment.

3.     Plaintiff seeks all available remedies—declaratory, injunctive and equitable relief; compensatory and exemplary damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of his disability in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794, and 42 U.S.C. § 1983 ("Section 1983").

4.     Plaintiff urgently seeks an emergency temporary restraining order ("TRO").  He seeks a TRO to (i) remove the probationary status under which he has been placed and which will delay his promotion to his fourth year of residency and (ii) order Defendants to promote him to

the fourth year of his residency, starting July 1, 2019.  These actions will prevent him from suffering irreparable harm during the pendency of this lawsuit and allow this Court to hear the merits of his claims.  Plaintiff is entitled to reasonable accommodations under federal law.  Those accommodations will allow him to successfully complete his fourth year of residency.

## II.
## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction based on federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the laws of the United States.

6.      Plaintiff's claims arise under the ADA, the Rehabilitation Act and Section 1983.

7.      Plaintiff has filed complaints or charges with the Equal Employment Opportunity Commission and the Office of Civil Rights of the Department of Justice.

8.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(1), (2) because Defendant UTHealth has its principal place of business in the Houston Division of the Southern District of Texas and/or a the discriminatory practices alleged herein occurred in the Houston Division of the Southern District of Texas.

## III.
## THE PARTIES

9.      Plaintiff Kyriakos Dalamagkas is a natural person residing in Harris County, Texas.

10.     Defendant UTHealth is a public university within The University of Texas System and receives federal funding.  McGovern Medical School is a component entity of UTHealth.  The Office of Legal Affairs for UTHealth can accept service of process for Defendants.

11.     The Board is tasked with the establishment and maintenance of UTHealth and the promulgation of rules and regulations governing the school.

12.     The Foundation is a state agency of the state of Texas, and it serves as administrator of UTHealth.   The Foundation administers all aspects of the residency training programs at UTHealth.

13.     The Individual Defendants (Dr. Uthman, Dr. Frontera, Moylan) are staff and administrators at UTHealth.   The Individual Defendants made decisions about the status of Plaintiff's medical residency, refused to accommodate his disability, denied his appeal of the probationary status imposed on him, and refused to consider the impact of the absence of requested accommodations on his academic performance.

14.     Whenever in this Complaint it is alleged that Defendant UTHealth committed any act or omission, it is meant that the UTHealth's officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification or approval of Defendant UTHealth or was done in the routine normal course and scope of employment of the officers, directors, vice-principals, agents, servants, or employees of UTHealth.

## IV.
## FACTUAL BACKGROUND

15.     Kyriakos Dalamagkas has lived an accomplished life.   He is only 30 years old, married, father to a baby daughter, and doggedly completing his third year of medical residency at UTHealth.   Dalamagkas has accomplished milestones desired by aspiring doctors—successfully completing medical school as valedictorian of his class, publishing research, and obtaining a residency at a top hospital.   Dalamagkas' achievements are not just impressive; they are absolutely

astonishing.  At the age of 17, Dalamagkas suffered a spinal cord injury when he slipped, headfirst into the shallow end of a pool.  Dalamagkas is a tetraplegic.  He has a complete spinal cord injury at the C-5 level.  He has no motor or sensory function at the C5-C6 level and below.  He is wheelchair bound.  He has limited use of his arms and cannot control his fingers.  He can use his wrists but without control of his fingers, the use of computers or even a smart phone is very difficult for him.  In the face of those obstacles, Dalamagkas' accomplishments are extraordinary.  Because of his own injury and his long rehabilitation process at one of the world's top rehabilitation programs for spinal cord injuries, Dalamagkas chose to devote his career to spinal cord injury and rehabilitation.

16.     After completing medical school in 2012 in Greece, he obtained his foreign medical certification (Education Commission for Foreign Medical Graduates certificate) in the United States in December 2012.  He received a Master's in Science in Nanotechnology and Regenerative Technology focusing on novel reparative research projects for spinal cord injury treatment from University College of London (a top university with a global reputation) in 2014.  He also was a post-doctoral research fellow at Harvard Medical School from 2014 until 2016 focusing on neural tissue engineering-based and neuroimaging-based strategies for central nervous system repair.  During all the years of academic and clinical training, Dalamagkas was accommodated as needed by all the involved institutions with either reasonable accommodations that were evaluated and re-evaluated in person in order to ensure that they were the right fit for him, or by altering certain expectations when the accommodations were not optimal. In terms of his evaluation and assessment, this was always verbal, he was given double time for any multiple choice question (MCQ) tests, he was provided with a scribe when documentation was necessary and a research or clinical assistant (dependent on the setting of the evaluation) for any hands-on evaluations, like

5

physical examination evaluations. Having the opportunity to thrive in environments that allowed him to perform with certain critical adaptations, he was awarded several merit-based scholarships and honors for his performance. His academic and clinical excellence was even awarded by the President of the Hellenic Republic, which would have been the equivalent of a US citizen being honored by the President of the United States of America. Dalamagkas pursued clinical training at top spinal cord injury programs and worked with historic and legendary figures in the field in order to develop a holistic view of the best approaches in spinal cord injury: University Hospital, Larisa, Greece; Massachusetts General Hospital (MGH), Boston; Brigham & Women's Hospital (BWH), Boston; University Hospital, Zurich; Stoke Mandeville Hospital, Buckingham, U.K.; National Hospital for Neurology & Neurosurgery, London; Spaulding Rehabilitation Hospital, Boston; Rehabilitation Institute of Chicago (RIC).

17.     Dalamagkas completed his first year of residency at Weiss Memorial Hospital in Chicago from June 2016 to June 2017. Dalamagkas began his second year of residency at UTHealth in 2017[1] and is now approaching the end of his third year (PGY-3) of residency.[2] He manually pushes his motor-assisted wheelchair. He does not have a car to transport himself. On a resident's salary, he cannot afford a vehicle modified for him or a fully motorized wheelchair. He tried to use the Houston METROLIFT program, but it is not reliable enough to get him to and from the medical center hospitals on time. He generally wheels himself to and from his apartment

---

[1] His first Notice of Appointment for his second year of residency—his first year with UTHealth—was offered by the Foundation. It was for appointment as a Post Graduate Year (PGY) 2 and Program Level RES 2 Physician effective July 1, 2017 and ending on June 30, 2018. The Notice of Appointment expressly incorporated the Graduate Medical Education Resident Handbook. He also agreed to be subject to and comply with the Rules and Regulations of the University of Texas System Board of Regents.
[2] Dalamagkas currently has a physician-in-training ("PIT") permit while a resident in a graduate medical program accredited by the Accreditation Council for Graduate Medical Education ("ACGME"). A PIT permit does not entitle a resident to assume professional activities outside of the residency program.

and his hospitals.  Dalamagkas has rented apartments as close as possible to his assigned hospitals because of those limitations.

18.    Dalamagkas' achievements against the backdrop of his disability and its limitations begs the question of what does it mean to be a physician.  Are hands necessary?[3]  Is vision necessary?  Is hearing necessary?  What **truly** makes a physician?  A March 1, 2019 article in the online *New Mobility* publication addressed this question.  The author of "Disabled Doctors: Healing the Medical Model?" wrote that while preparing his article, he only found 25 wheelchair-bound physicians in the U.S.[4]  The medical establishment has been slow to comply with the ADA and other antidiscrimination laws.  Nearly thirty years after the passage of the ADA, there is a small handful of quadriplegic/tetraplegic practicing physicians in the U.S.  A few examples are Dr Jim Post (New York); Dr. Oluwaferanmi O. Okanlami (Michigan); Dr. Sam Simms (Missouri); and Dr. Chris McCulloh (New Jersey).  These physicians have been able to successfully complete residency programs and practice medicine with accommodations.

A.    **Joining UTHealth in 2017**

19.    When Dalamagkas accepted his residency position with UTHealth in the summer of 2017, he was thrilled to join the Physical Medication and Rehabilitation (PMR) Department, recognized as one of the nation's leading PMR departments.  The PMR Department's Spinal Cord Injury program is the oldest program in the department.  To make absolutely certain that he was prepared, before his residency began Dalamagkas submitted a formal written request for accommodations.  Of course, the PMR program physicians were fully aware of his limitations.

---

[3] "I would like to see the day when somebody would be appointed surgeon somewhere who had no hands, for the operative part is the least part of the work."  Harvey Cushing, MD, the father of neurosurgery, in a letter to Henry Christian, MD, November 20, 1911.
[4] Gilmer, Tim. "Disabled Doctors:  Healing the Medical Model?" *New Mobility,* March 1, 2019, http://www.newmobility.com/2019/03/disabled-doctors/.

After all, they *are* spinal cord injury experts.  In the 2017 UTHealth form for request for accommodations, that Dalamagkas completed, he provided a lengthy description of his injury, his prior accommodations, and the accommodations he anticipated needing at UTHealth.  During his first year of residency in Chicago, Dalamagkas was assigned a staff member (e.g., nurse and volunteers with medical background) to help during some physical examinations of patients, a transcription company for dictation of notes via phone, remote systems access with a laptop instead of use of the hospital desktops, schedule flexibility, exclusion from the night shift and 24-hour schedule, and the exchange of an easier rotation with a more demanding rotation addition like ICU in his annual schedule (because of exclusion from being on-call 24 hours).  He explained that a transcription company was preferred over dictation software because of the latter is more accurate.

20.    In his 2017 request form, he explained his needs for some flexibility with his working hours.  He described his prior accommodations in medical school, during his master's program and when taking tests/examinations, including a note taker, laboratory assistant, wheelchair-accessible rooms, assistive equipment, extra time during examinations, oral examinations instead of written examinations, a track pad, a small keyboard, an adjustable height examination table, use of a scribe/amanuensis for patient interviews, use of a trained intermediary for patient examinations, and use of specially-adjusted examination tools.  His personal physician also completed a UTHealth form on April 10, 2017, reiterating many of the same accommodation needs requested by Dalamagkas.

## B.    Defendants' failure to provide accommodations

21.    Despite his clear explanation of and request for the accommodations that had previously been provided to him, UTHealth provided lesser accommodations beginning in 2017 and continuing until now.  In a written response dated June 28, 2017, Defendants responded that

Dalamagkas would be granted the following accommodations: "a UTHealth laptop with an extended power battery;" "Dragon Dictation Software – Medical Version and provided training through Memorial Hermann Hospital;" "flexible work schedule … exempted from 24 hour on call duties but will maintain home calls for his 1st three months with a backup system in place; [n]o more than 12-hour shifts; 1-hour break every day for physio/leg lifting; or 2-hours on long days;" "remote access . . .;" "assistance as needed in performing complete physical exams on patients in the morning hours." Not wanting to appear ungrateful or overly demanding, Dalamagkas expressed a willingness to try some of the proffered accommodations. The accommodations were inadequate. Defendants never assigned one person to help Dalamagkas with examinations, forcing him to try to find someone to help him during busy morning rounds and often finding no one available. Dalamagkas informed Defendants that the Dragon Dictation software was inadequate. At times, there have been breakdowns in understanding by chief residents and attendings about the accommodations needed by Dalamagkas because Defendants did not inform all team members about the granted accommodations. This has led to confusion about his schedule and a lack of understanding about delays in his documentation.

22.    Dalamagkas continued to demonstrate his professionalism by communicating on his own about the granted accommodations, his disability limitations, and the accommodations-related ongoing problems with faculty members before starting each of his rotations. He soon discovered that without official notifications, no attending physician was able to modify the routine of the clinics to which Dalamagkas was assigned to accommodate him. He was mostly staying in the clinic for very long hours, based on the attendings' preferences, and during inpatient rotations he had to write (daily) 10-14 patient medical notes, despite the granted accommodations for a modified schedule for his pressure relief and for a reduced patient load. Dalamagkas pushed

himself to the limits in order to make this happen, jeopardizing his well-being, reducing physiotherapy hours, eliminating his pressure relief, and foregoing his required sleep.

23.     Dr. Frontera and the chief residents were positive that if Dalamagkas just worked harder, he would be able to accomplish the impossible.  They disregarded Dalamagkas' expressed concerns about the lack of accommodations needed for his educational experience.  Even when he was eventually allowed by the more understanding faculty members of PMR to write a limited amount of notes, he was still following all the patients closely, always surpassing the minimum required and many times even the maximum allowed number of patients as per ACGME for PMR. Given such incidences, in an attempt to find a viable solution especially for the highly demanding inpatient rotations, Dalamagkas explored even the option of staying in the hospital for his pressure relief break, utilizing a sleep study room, but it soon became apparent that the help of his wife was needed because he was not provided with a nurse to help him transfer from the wheelchair to the bed and vice versa, making this accommodation unusable when his wife's responsibilities would not allow her to be at the hospital.  Dalamagkas voiced his concerns multiple times, but no faculty members wanted to intervene despite their understanding of the situation. An in-person evaluation was never done consider whether his accommodations were effective, whether his concerns about their adequacy were valid, and the feasibility or increased value of other accommodations to allow him to have once again optimal performance (both physically and mentally) as he used to have in accommodating environments before UTHealth.

C.     Absence of accommodations quickly led to negative feedback

24.     In August 2017, almost immediately after Dalamagkas joined UTHealth, Defendant Dr. Frontera, the Residency Program Director, provided Dalamagkas feedback via e-mail.  The feedback consisted of issues with written documentation, including completeness of

10

information and use of templates; using cell phones instead of email to improve communication; and suggesting that research should be a lower priority for Dalamagkas. Yet, Dr. Frontera also acknowledged that assistive technology was still needed for Dalamagkas.

25.    Just a month later, in September 2017, Dr. Frontera sent Dalamagkas another email. He said Dalamagkas continued to have documentation issues, disorganized case presentations, and insufficient physiatry knowledge and general medical knowledge.   Dalamagkas expressed appreciation for the positive feedback and said he would work harder.  Dalamagkas continued to inform attending physicians, Dr. Frontera and chief residents that delays and difficulties he experienced, and about which they complained, were due to inadequate accommodations and his disability.

### D.    Scant formal feedback with a gap of almost a year

26.    About six months into his residency, Dr. Frontera provided Dalamagkas formal feedback in a January 31, 2018 letter implementing a remediation plan.  The concerns expressed were repetitive of the earlier emails.  They primary focus was written documentation.  Given Dalamagkas' inability to use his fingers, the January 31 letter's complaints mostly stem from the lack of appropriate accommodations provided by Defendants.  Dr. Frontera complained about delay in response to phone calls and text messages, the placement of patient orders, the performance of certain tasks, like discharge summaries, quality of documentation and alleged gaps in medical knowledge, reporting late to a clinic or an examination, and some lapses in updating sign-out forms.  Dr. Frontera wrote that Dalamagkas would be placed on a remediation plan. Dalamagkas expressed gratitude and responded by working harder, even without all his needed accommodations.

27.     Trying to be proactive after the receipt of the January 31, 2018 letter, in an attempt to resolve the documentation problem that was the primary concern of Dr. Frontera, Dalamagkas focused his attention in requesting a scribe from the disability office, to remove this physical barrier and allow him to demonstrate improvement.  Dalamagkas even managed to secure funding (on his own) for a scribe for his work for the period May 2018 to May 2019 from the Texas Workforce Commission ("TWC"), as discussed below, but the disability office still did not manage to use the funds and provide the needed scribe because of several alleged policy-related issues. Even though Dalamagkas reached out several times since May 2018 to the disability office checking on the status of his request for a scribe (to help with his performance), not until after March of 2019 did the disability office clearly articulate that the scribe was a non-viable option and other accommodations should be explored if needed.

28.     Dalamagkas received an appointment to his third residency year for the July 1, 2018 through June 30, 2019 academic term.[5]  Presumably, if Defendants had grave concerns about his performance, he would have been notified before his promotion to PGY-3.

29.     During his nearly 24 months of residency at UTHealth, Dalamagkas received only three formal evaluations by Dr. Frontera in New Innovations (an online residency management system):  November 2018, December 2018, and May 2019 (discussed later in this Complaint).[6]  In November, Dr. Frontera rated Dalamagkas one level below satisfactory in 11 out of 32 areas.  In December, Dr. Frontera ranked  Dalamagkas higher in eight of those 11 areas and lower in five

---

[5]  The Foundation's Notice of Appointment for his PGY-3 and Program Level 3 year was for a one-year term.  It otherwise contained identical terms to the first UTHealth residency year appointment received by Dalamagkas.
[6]  The Graduate Medical Education Resident Handbook ("Resident Handbook") states that residents "should generally be evaluated at least twice each year based on the ACGME core competencies and the Resident's performance . . . ."  The Resident Handbook also provides that "[e]valuations should be communicated to the Resident in a timely manner." Evaluations are maintained in New Innovations.  If a Resident is not performing satisfactorily, the Program Director (Dr. Frontera in this case) "must document the deficiencies and outline a plan or program to correct the deficiencies."

different areas.  Only one month after receiving less than satisfactory evaluations in categories rating medical knowledge, diagnostic skills, and clinical judgment, prescribing appropriate care plans, and dealing with complex medical problems, Dalamagkas improved all those scores to satisfactory.  In the December evaluation, Dr. Frontera wrote, "Some improvement noted since last rotation in terms of medical knowledge. Still having issues with documentation and timeliness even with available resources.  Feedback given – Issues with punctuality also discussed – Documentation is somewhat incomplete at times – Still behind on knowledge base."  Dr. Frontera's issues with documentation and timeliness are the obvious consequences flowing from Defendants' failure to provide his needed accommodations.

### E.    Notice of promotion to fourth year of residency

30.    Between July 2018 and April 1, 2019—more than half of his third residency year, Dalamagkas completed nine rotations.  He was not given any formal feedback during that period. He also was not given any informal feedback, despite his asking for it.  When he expressed concern, his chief resident told him not to worry, all would be fine because this was typical for the residency program.  Between October 2018 and the end of January 2019, Dalamagkas received some emails with criticism about missing a lecture, being absent from or arriving late to some didactics sessions, and a delay in logging his duty hours.  Dalamagkas apologized, provided explanations, and corrected these issues to the extent that was humanly possible, working overtime with his last notes being submitted frequently after 10 p.m. and waking up even earlier than 5 a.m. to manage the working load and administrative load in a "not-adapted" working environment. Full resolution of his alleged deficiencies has not been possible because, as Dalamagkas had discussed many times with Dr. Frontera, the chief residents, the attending physicians, and the diversity office, the lack of accommodations were leading to problems like those, and, soon, led to several sickness

13

leaves that were unusual for Dalamagkas, given he had not experienced them before UTHealth when training at other institutions.

31.     Dalamagkas received *no* formal evaluation of his performance from January 2018 until March 26, 2019.   In the middle of January 2019, Dalamagkas received a notice of appointment for PGY-4 (year four) as a resident for the term of July 1, 2109 to June 30, 2020 in PMR.[7]  Dalamagkas accepted this appointment on February 25, 2019.  On March 6, 2019, Dr. Frontera submitted a supplemental Form I-644:  "Supplemental Statement for Graduate Medical Trainees to INS" for foreign medical doctors with a J-1 visa.   Dr. Frontera certified that Dalamagkas was in good standing in the PMR residency program.

### F.     March 26, 2019 probation letter

32.     Dalamagkas was surprised to receive a March 26, 2019 written notice from Dr. Frontera that he would be placed on four-month probation from March 26 to October 31.  During the preceding 14 months, Dalamagkas worked hard to improve any deficiencies even without all his needed accommodations.  The imposition of this probation is nonsensical given that UTHealth had issued to Dalamagkas notice of promotion to his fourth year of residency.  Nothing new happened between February and March 26.   Dalamagkas was not given any examples of unacceptable behaviors or poor performance during that two-month period.  Dr. Frontera certified on March 6—just 20 days before the probation notice—that Dalamagkas was in good standing as a UTHealth resident.  The imposition of probation following the absence of any negative feedback during the nine rotations he had between July 1, 2018 and the end of March is contrary to the Resident Handbook.  As noted above, prior to the proposed probation, Dalamagkas had received only two formal evaluations in New Innovation, one of which showed improvement.

---

[7]  This notice of appointment was not offered by the Foundation.  Instead it refers to UTHealth and McGovern Medical School.

33.     Dalamagkas filed an internal appeal of the probation decision.[8] Dalamagkas was notified that the appeals he could pursue based on UTHealth policies could be only on the grounds of the lack of received guidance and feedback to allow Dalamagkas to improve.  He was told that he could not argue the lack of accommodations impacted his residency.  Even with the glaring absence of timely negative feedback, the first-level appeal was denied on May 3, 2019, after review by a subcommittee determined that he had been provided the requisite "notice and guidance regarding [his] probation" by Dr. Frontera.  Dalamagkas appealed to Defendant Uthman (May 16), and she denied it, telling him the probation is not negotiable and if does not agree to it, he must leave the residency program.

34.     Even before his appeals were exhausted, Defendant Frontera prepared a form titled "Required Notification of Exchange Visitor Physician Remediation" to be filed with the Exchange Visitor Sponsorship Program ("EVSP").  Dr. Frontera indicated on May 7 in that form that Dalamagkas was on probation.  This was just two months after he represented to the government that Dalamagkas was in good standing.  Again, there is no documentation showing what (if anything) transpired during those two months to prompt this about-face.  Nothing significant happened.

35.     Dalamagkas has refused to formally agree to the four-month probationary period.  If it remains in effect, the probation will delay the completion of his PGY-3, which, in turn, means that he will not complete his PGY-4 residency in June 2020 when the academic year ends or be able to start a spinal cord injury fellowship program in July 2020.  If the probation remains in

---

[8] The appeal process is outlined in the Resident Handbook.  The subcommittee designated to review the academic decision is limited to the determination of whether the Resident was provided the requisite notice of deficiencies and the opportunity and guidance to enable the Resident to correct the deficiencies and to act in a manner consistent with the law, the training program, Program guidelines and requirements, and the reasonable exercise of professional medical judgment.

effect, Dalamagkas either will be off cycle, be forced to accept less desirable fellowship options that do not fill their positions by July 2020, or he will experience unemployment until the next round of fellowship programs begin in July 2021. *Otherwise,* to avoid any potential unemployment in 2020 and related immigration issues, he must complete a full fifth year of residency (ending in June 2021) and attempt to obtain a fellowship beginning in July 2021. Dalamagkas currently has an interview scheduled for a fellowship at Harvard/Spaulding that would begin in July 2020.  Dalamagkas aspires is to join one of the two dozen or so coveted fellowship programs in spinal cord injury and focus on research.  Decisions about fellowship program acceptances will be made in October 2019.  Even assuming a fellowship program will consider him as a candidate with probation on his record, the four-month probation necessarily will prevent him from starting a fellowship next July.  Since before starting his residency at UTHealth while he was being interviewed, Dalamagkas expressed to Defendants his goal of becoming a physician scientist with a focus on research on spinal cord injury after obtaining a fellowship in that area.

36.     A probation also will impact Dalamagkas' application for a license to practice medicine, which is normally obtained after completion of residency, and likely taint his professional reputation.[9]  At this juncture, there is a significant risk that with this probation in place, Dalamagkas will lose a coveted fellowship program, rendering as moot the last seven years of work (five years in the US).  If he becomes unemployed, he will lose his J-1 visa and possibly

---

[9] The full impact of probation can vary from one residency program to another and can depend on the state licensing board where the resident applies for a license.  *See* "Defining Uniform Processes for Remediation, Probation and Termination in Residency Training," *West J. Emer. Med.*, vol. 18(1), January 2017, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5226740/ ("Probation is disclosed in the final verification of training, employment letters and letters of reference."); "Legal Considerations in the Remediation and Dismissal of Graduate Medical Trainees," *Journal of Graduate Medical Education*, Vol.10 (3), June 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6008017/ ( "Probation status is generally reported on future letters of reference and to licensing boards and employers.")

must leave the U.S. within thirty days,[10] which would be dire for him.  His wife is his only caregiver.  She has a job in the U.S., and they have a young daughter.

37.     The only credible explanation for this farce and illogical change of position is that Defendants do not want to do what is necessary to grant Dalamagkas the accommodations he clearly needs and has requested and do not want to deal with disability any longer.  Defendants keep increasing their demands of him and making them unobtainable, trying to force him into an untenable position (*i.e.*, quit or let UTHealth ruin your career).

### G.     Repeated requests for accommodations

38.     Dalamagkas has persisted with his repeated requests for the accommodations he needs to successfully perform as a resident.  Those requests have upset Defendants, who simply do not want to go through the effort or spend the necessary time and/or funds for the accommodations, which they knew Dalamagkas needed from before his start of the PMR residency program.  Even before he started his PMR residency at UTHealth, Dalamagkas suggested by e-mail in April 2017 that the chief resident at TIRR could talk to the chief residents who had supervised Dalamagkas in Chicago about the accommodations provided to him during his PGY-1.  Throughout his last two years of residency, he repeatedly has told Dr. Frontera, his attending physicians and chief residents about difficulties and delays due to the lack of accommodations.  By way of example only, he explained in a July 22, 2017 email to PMR physician that he was experiencing delays with the dictation software.   He emphasized the need for further accommodation in an email of August 7, 2017.  He asked again the next day about a headset accommodation.   He continued to reiterate his need for a scribe thorough 2017 and 2018.

---

[10]  *See* Education Commission for Foreign Medical Graduates, "Selected Federal Regulations for J-1 Physicians," https://www.ecfmg.org/evsp/applicants-regulations.html (stating that 30-day grace period might not apply in instances of early termination).

(Dalamagkas rarely writes emails.  They are written by his wife because writing emails is very time consuming for him due to his disability.)  The scribe was never provided.  Other options, such as a dictation system at one of the affiliated hospitals, were considered, but in another hospital, a different dictation system was provided but was not functional.  In August 2018, Dalamagkas wrote to the diversity office that many of his attendings had told him that his education would be compromised if he did not get a scribe or other assistance in the clinics.  The dictation software provided continued to pose challenges.

39.     After receiving the January 2018 letter from Dr. Frontera, Dalamagkas requested more accommodations.  He asked for a schedule accommodation.  "In addition to what I previously requested, I found out that my inpatient months in TIRR Memorial Hermann were very physically demanding for me and I was unable to maintain my physiotherapy and take any reasonable breaks for my body to function properly.  I could partially compensate for this if I can avoid the on calls for those specific inpatient months only . . . .  I kindly request for a reasonable accommodation in terms of my schedule during those inpatient months."  This accommodation was granted and generally has been adhered to.  In May 2018, Dalamagkas applied for assistance from the TWC. His goal was to determine if he could receive financial assistance from the State of Texas to allow UTHealth to better accommodate him.  Dalamagkas wanted to ensure that funding was not the reason why the disability office was not providing a scribe. Taking Dr. Frontera's previous feedback and remediation plan very seriously, Dalamagkas secured the funding for the scribe to be employed by the PMR Department for May 2018 until May 2019.  Nevertheless, UTHealth said policies prevented it from employing a scribe to accommodate Dalamagkas' clinical schedule. The disability office repeatedly did not respond to Dalamagkas' urgent requests.  He persisted until the office provided him an explanation *after* the probation decision was made.

40.     After the surprising probation notice, Dalamagkas reached out to Defendant Moylan to request that he immediately be provided a physician's assistant.  On May 13, he submitted a written request on a UTHealth form.  He explained the reasons in detail.  The following excerpt illustrates the importance of his renewed requests for assistance:  "The provision of a PA is vital for reaching the new expectations set in the probation letter. . . .  Written feedback is very important to allow me to revisit the problematic areas and improve.  It will be very important to educate the faculty in each rotation that an email or paper with written feedback (one in the middle of the rotation and one in the end of the rotation) is essential. . . .  Finally, it is very important for the attendings to be aware of the reasonable accommodations with the modified schedule, adapted evaluation methodology, and the reduced volume of patients I can take. . . ."  He said that the prior lapses in communication had compromised his education during those rotations.  He also offered by email to Defendant Moylan that he had spoken with other disabled physicians to determine how they succeeded in their residency programs.  He suggested that UTHealth speak with at least two of them, one of whom had a similar injury and functional capacity like Dalamagkas and was provided a nurse during his residency to allow him to complete his residency on time and with the use of simplified templates for writing notes.  Dalamagkas was fully transparent and pleaded that he was trying to get more accommodations because of new expectations from Dr. Frontera.  He is unaware of the office ever reaching out to the physicians who he suggested they contact.

41.     On May 24, Defendant Moylan responded with an offer of accommodations, including the provision of a medical assistant (MA) and formal written feedback after completion of rotations.  Defendants denied his request for a schedule change, but because he had experienced deep tissue injuries from his prior schedule, Defendants agreed to follow up with Dalamagkas "with specific requirements for on-site hours once agreed with the conditions for  Dalamagkas

residency completion." Defendants also declined his request to be able to watch recorded morning lectures.

42.     In response, Dalamagkas explained the deficiencies with the prior arrangements. Defendant Moylan also falsely claimed that Dalamagkas had not asked for all the accommodations prior to his probation. He did, and in any event, he can ask for additional accommodations as his needs change or the Defendants' expectations change. On May 31, 2019 in a meeting, Defendants orally denied his request for a physician's assistant with some odd explanation proffered later that Defendants do not think they can assess Dalamagkas if he has a physician's assistant helping him with patient examinations. This is a terrible excuse. Yet, as of the filing of this lawsuit, Defendants have not provided Dalamagkas with an appropriate alternative. Defendants posted a job opening for a medical assistant, and Dalamagkas participated in interviews the week prior to the filing of this lawsuit. As of the date of this lawsuit, he still does not have an assistant.

43.     Dalamagkas has filed an internal appeal of the denial of his accommodation request for a qualified assistant. That appeal is pending. He also has very recently filed a formal internal complaint of disability discrimination and failure to accommodate. To the best of his knowledge, an investigation into those complaints has not been initiated. He is very concerned about retaliation stemming from those complaints and the filing of this lawsuit.

**H.     Fear of future dismissal and retaliation**

44.     Given the untenable positions taken by UTHealth throughout the last few months, Dalamagkas fears that he is going to be dismissed regardless of his efforts. He has repeatedly said he needs a qualified assistant, and he has repeatedly said that the dictation software is not adequate for the expectations of his UTHealth residency. During his last rotation that ended on May 31, 2019, the attending physician, Christine Krull, MD, said that Dalamagkas' performance was

satisfactory for all the PGY-3 milestones with feedback given to him on further "working on reading non-verbal communication," "continuing to learn new knowledge from specific patients," "working on thinking ahead and doing documentation in advance before patient leaves the hospital," in the next rotation.  Dr. Krull noted in her evaluation that it will be interesting to see further potential of Dalamagkas with other accommodations in place.  Yet, in Dr. Frontera's May 31, 2019 evaluation in New Innovations (*only the third evaluation ever completed by Dr. Frontera*), he lowered Dalamagkas' scores to one less than satisfactory in 21 of the 32 categories. This is a flagrant late attempt to justify the March 26 probation letter.  It also is evidence of Defendants' retaliation against Plaintiff for his complaints about disability discrimination and failure to accommodate.  Even more incredulous, Dr. Frontera persisted with his complaint about written documentation: "[d]documentation needs to improve. . . . relying on copy/paste function." Yet, Defendants refuse to accommodate him.

45.     Only *after* placing Dalamagkas on probationary status, Defendants offered to hire a medical assistant, a position that does not require any medical training or knowledge of medical terminology.  Dalamagkas objected, saying that a PA or a nurse would be better qualified (based on his prior experiences).  UTHealth has told Dalamagkas that he must agree to the four-month probation or resign from the residency program.  Neither is an acceptable outcome.  If Dalamagkas experiences unemployment, he is at risk of his J-1 visa expiring and having to leave the country. His wife is his only caregiver.  She also is employed by a hospital (in Boston, where Dalamagkas hopes to start a fellowship), and she would need to renegotiate her employment contract to support the entire family.  He risks the loss of his promising career, a smear on his medical license, the loss of his caregiver and his daughter, and he faces potential deportation.

21

46.     UTHealth has articulated no reason why Defendants cannot promote him to PGY-4 and reevaluate him in a few months or midway through his fourth year—after UTHealth grants him more accommodations (or this Court orders UTHealth to do so), or even decide not to graduate him from the residency program after PGY-4 if he fails to perform with the remainder of his accommodations being granted.

47.     Defendants' repeated denials of his requests for accommodations, following his complaints about those denials and his complaints that Defendants are compromising his residency training, are retaliatory.  The latest evaluation by Dr. Frontera is retaliatory.  The decision not to provide him a PA even after implementing probation and deciding to delay his progression to PGY-4 stem from both discrimination and retaliation.  Absent a Court order enjoining retaliatory conduct, Plaintiff faces a significant risk that Defendants will continue to engage in retaliatory conduct.

## V.
## CLAIM I: DISCRIMINATION, FAILURE TO ACCOMMODATE AND RETALIATION IN VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

48.     Plaintiff repeats and re-alleges all preceding paragraphs in support of this claim.

49.     At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, *et seq.* has been in full force and effect and has applied to Defendants' conduct.

50.     At all times relevant to this action, Plaintiff has been substantially limited in the major life activities of walking, standing, sitting, *et al.*, and is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

51.     Defendant UTHealth is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1).

52.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

53.     Federal regulations implementing Title II of the ADA provides that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  28 C.F.R. § 35.130(b)(1).

54.     Plaintiff requires reasonable accommodations from UTHealth and the Individual Defendants during his medical residency.  He is entitled to those aids, benefits, and services in pursuit of his public higher education.

55.     As an additional and/or alternative claim, Plaintiff requires reasonable accommodations from UTHealth and the Individual Defendants due to the status of UTHealth as his employer.

56.     The ADA requires medical schools—in their capacity as a school and as an employer—to engage in an interactive process with individuals with disabilities to evaluate how their conditions may be accommodated.  Defendants failed to engage in an adequate interactive process with Plaintiff to determine how Defendants could sufficiently accommodate Plaintiff's condition; this failure constitutes a willful violation of the ADA.

57.     Defendants' denial of Plaintiff's requested reasonable accommodations reflects Defendants' willful and/or reckless disregard of the ADA.

58.     Plaintiff has suffered emotional pain, humiliation, mental anguish, loss of enjoyment of life and emotional distress.

59.     Defendants' violations of the ADA constituted gross, wanton, reckless and/or intentional violations of his rights under the ADA, entitling Plaintiff to punitive damages in an amount sufficient to punish Defendants and deter others from engaging in similar misconduct.

60.     Defendants have discriminated against Plaintiff, on the basis of his disability of tetraplegia, in violation of Title II of the ADA and its implementing regulations.  The refusal to promote Plaintiff to the fourth year of residency and the imposition of probation violate Tile II of the ADA.  Congress' abrogation of sovereign immunity in this case is valid.

61.     Defendants also have retaliated against Plaintiff in violation of the ADA.

62.     Plaintiff asserts a Title II ADA claim against all Defendants and seeks all available injunctive and declaratory relief.  Plaintiff also seeks an award of compensatory relief, attorneys' fees, costs, and disbursements.

## VI.
## CLAIM II: DISCRIMINATION, FAILURE TO ACCOMMODATE AND RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

63.     Plaintiff repeats and re-alleges all preceding paragraphs in support of this claim.

64.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, was in full force and effect and applied to Defendants' conduct.

65.     At all times relevant to this action, Plaintiff has had substantial impairment to the major life activities of walking, standing, sitting, *et al.* within the meaning of the Rehabilitation

24

Act regulations at 45 C.F.R. § 84.3(j).  Accordingly, he is an individual with a disability as defined under 28 U.S.C. § 708(20)(B), Section 504, as amended.

66.     At all times relevant to this action, Defendant UTHealth and/or the Foundation has received federal funds, and has therefore been a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

67.     Pursuant to Section 504, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …." 29 U.S.C. § 794.

68.     Defendants have discriminated and continue to discriminate against Plaintiff solely on the basis of his disability by denying him meaningful access to the services, programs, and benefits the Defendants offer to other individuals, and by refusing to provide assistive technology and services necessary for Plaintiff to effectively complete his duties as a resident, in violation of Section 504 of the Rehabilitation Act.  29 U.S.C. § 794.  Both the probation, refusal to promote Plaintiff to his fourth year of residency, and the denial of requested accommodations violate Tile II of the ADA.

69.     Defendants also have retaliated against Plaintiff in violation of the Rehabilitation Act.

70.     Plaintiff asserts a Section 504 claim against Defendants and is entitled to compensatory damages, injunctive relief, punitive damages, and an award of attorney's fees, costs, and disbursements.

## VII.
## CLAIM III: SECTION 1983 VIOLATIONS

71.     Plaintiff adopts by reference all of the facts set forth above.  *See* FED. R. CIV. P.
10(c).

72.     Plaintiff alleges against the Individual Defendants claims under 42 U.S.C. § 1983.
The Individual Defendants violated Plaintiff's rights to substantive and procedural due process
under the Fourteenth Amendment.

73.     Plaintiff has a constitutionally protected interest in his public higher education.

74.     Although framed as an academic decision, the decision to place Plaintiff on
probation and not to allow him to progress to the fourth year of his residency was made without
consideration of his disability and the accommodations he had been wrongfully denied.  His
substantive and procedure due process rights were violated because the impact of those
accommodations was not considered by any of Defendants.

75.     The Individual Defendants' actions were such a substantial departure from accepted
academic norms as to demonstrate they did not actually exercise professional judgment.

76.     Plaintiff seeks declaratory and injunctive relief against all the Individual
Defendants, except for Moylan, for violation of his due process rights.

## VIII.
## EMERGENCY APPLICATION FOR TEMPORARY
## RESTRAINING ORDER[11]

77.     Plaintiff ask this Court to enter an Emergency Temporary Restraining Order
granting the relief requested herein.

---

[11] Pursuant to the Southern District Local Rules, a separate Application for a Temporary Restraining Order will be
filed with the Court.

78.     It is probable that the Plaintiff will prevail against the Defendants on the merits and obtain permanent injunctive relief precluding the violations of law alleged herein.

79.     If the Plaintiff's Application for Temporary Restraining Order and Injunctive Relief is not granted, irreparable harm is imminent because, on information and belief, Defendants intend to continue their unlawful actions.

80.     Plaintiff has no adequate remedy at law because the substantial damages and harm from Defendants' conduct are incalculable and a money judgment could not serve as adequate compensation for the wrong inflicted on the Plaintiff.

**IX.**
**REQUEST FOR INJUNCTIVE RELIEF**

81.     Plaintiff asks the Court to set this request for preliminary injunction for hearing, and after the hearing, enter a preliminary injunction granting the relief requested herein.

82.     After a full trial on the merits, Plaintiff asks the Court to enter a permanent injunction granting the relief requested herein.

**X.**
**JURY DEMAND**

83.     Plaintiff demands a jury trial.  The fee has been paid.

**XI.**
**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court grant the following relief:

a.      Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and due process violations under 42 U.S.C. § 1983;

b.      Issue an injunction forbidding Defendants from placing Plaintiff on probationary status from March 26, 2019 to October 31, 2019;

c.      Issue an injunction requiring the removal/expungement from Plaintiff's record of any reference to remediation or probation arising from the March 26, 2019 probationary letter;

d.      Issue an injunction preventing Defendants from notifying any governmental agency or board that he has been placed on remediation and/or probation;

e.      Issue an injunction ordering Defendants to develop a comprehensive plan of reasonable accommodations to be negotiated with and agreed to by Plaintiff within 15 days of entry of the Court's TRO and thereafter to be reviewed quarterly by Plaintiff and Defendants in person to review the adequacy of the accommodations and make any necessary modifications;

f.      Issue an injunction ordering Defendants to provide Plaintiff written feedback at the end of each rotation during the remainder of his residency with UTHealth;

g.      Issue an injunction ordering Defendants to provide to Plaintiff on or before December 31, 2019 a written evaluation of his performance during the first half of his fourth residency year;

h.      Issue an injunction ordering the Defendants:

     i.      To develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Plaintiff or other wheelchair bound and/or tetraplegic/quadriplegic individuals;

    ii.     To develop, implement, promulgate, and comply with a policy requiring the grant of accommodations that will assist wheelchair bound and/or tetraplegic/quadriplegic individuals during their residency and/or fellowship program, including, without limitation, the provision of qualified

assistants to help with patient examinations and obtaining patient histories, the provision of a scribe or adequate dictation software, schedule flexibility, and video recordings of live lectures or didactic sessions, and provide such accommodations as soon as practicable upon request;

iii.     To develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are wheelchair bound and/or tetraplegic/quadriplegic of their rights to accommodations'

iv.     To notify all students, faculty and hospital staff who need to know of the accommodations granted to a resident or follow.

i.     Award to Plaintiff:

i.     Compensatory damages;

ii.     Reasonable costs and attorneys' fees;

iii.     Interest on all amounts to the highest rates and from the earliest dates allowed by law;

iv.     Punitive damages;

v.     Any and all other relief that this Court finds necessary and appropriate.

Respectfully submitted,

**KARLA EVANS EPPERSON LAW PLLC**

By: */s/ Karla Evans Epperson*
Karla Evans Epperson
Attorney-in-Charge
State Bar No. 24002067
Southern District ID 21972
6629 Brompton Rd.
Houston, TX 77005
Telephone: (713) 775-8785
karla@keelawtx.com

**ATTORNEY IN CHARGE**

**OF COUNSEL**

Brian H. Tew
TEW LAW FIRM
State Bar No. 00785095
Southern District ID 281710
5020 Montrose Blvd., Suite 700
Houston, TX 77006
Telephone: (713) 523-1477
brian@doctoratty.com

## VERIFICATION

I, Kyriakos Dalamagkas, declare as follows:

1. I am the Plaintiff in the present case, a citizen of Greece, and a resident of the State of Texas. I am authorized to live and work in the United States.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing *Plaintiff's Verified Original Complaint and Emergency Application for Temporary Restraining Order and for Preliminary Injunction;* and if called on to testify I would competently testify as to the matters stated herein.

3. I have personal knowledge of UTHealth, the residency program, the Individual Defendants, their activities and their intent for my requested accommodations and my residency, including those set out in the foregoing *Verified Original Complaint and Emergency Application for Temporary Restraining Order and for Preliminary Injunction,* and if called on to testify I would competently testify as to the matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Defendants, their activities, and their intentions. 28 U.S.C. § 1746.

Executed on June 23 , 2019

Kyriakos Dalamagkas